Nelsine Behles, Appellee, v. Chicago Transit Authority, Appellant.

Gen. No. 45,417.

Opinion filed February 19, 1952. Released for publication March 3, 1952. To be published in full at the order of the Court March 24, 1952. Released for publication April 7, 1952.

THOMAS C. STRACHAN, JR., JAMES O. DWIGHT, GEOFFREY B. FLEMING, and ARTHUR J. DONOVAN, all of Chicago, for appellant; JAMES E. HASTINGS, of Chicago, of counsel.

JAMES A. DOOLEY, of Chicago, for appellee.

MR. PRESIDING JUSTICE TUOHY delivered the opinion of the court.

Plaintiff sued defendant for personal injuries alleged to have been received while alighting from defendant's bus. The case has been tried twice. The first trial resulted in a verdict of not guilty, after which a new trial was granted. The second trial resulted in a verdict for the plaintiff in the sum of $47,500, and from a judgment thereon this appeal is prosecuted.

As grounds for reversal defendant urges (1) that the verdict is against the manifest weight of the evidence; (2) that the trial court's exclusion of certain medical and demonstrative evidence was prejudicial error; (3) that the court erred in giving a certain instruction on behalf of plaintiff; and (4) that the verdict is excessive.

Plaintiff, a married woman 26 years of age at the time, was a passenger on defendant's bus at about 9:00 a. m., October 3, 1945, at the northwest corner of Kimball avenue, a north and south street, and Bryn Mawr avenue, an east and west street, in the City of Chicago. The evidence supports the following version of the occurrence: While the bus was stopped at the northwest corner of the above intersection, plaintiff stepped into the stairwell of the bus at the right front door, preparatory to alighting. Before her feet touched the ground, the doors closed, catching her head as they came together. The bus was operated by a driver who sat in the lefthand front corner. He also operated the doors which permitted passengers to board and alight from the bus. The doors consisted of two sections, making a 2-foot opening. On the closing edge of each section was a "U" shaped piece of rubber which formed a 2-1/4 inch cushion on each of the two closing edges. The rubber was 3/32nds of an inch thick. The pneumatic doors were operated by an engine equipped with adjusting screws for speeding or slowing the action of the doors and the position of the

screws, which were operated by hand, determined the speed of closing the doors. In a normal operation the doors are slowed up by air pressure as they reach a closing position. The plaintiff testified that the doors "collapsed" on her forehead.

After the accident plaintiff walked two blocks to the F. W. Woolworth store at Bryn Mawr and Spaulding avenues, where she was employed as a cashier and bookkeeper. She had a headache, but worked all day. As the day went on the headache got worse. She also observed a weakness in the right hand which she described in the following language: "When I would give out change, I would drop it and have to pick it up and hand it over again, and also, at times, I would drop a pencil, but I didn't know what was the matter." At noon she went to a restaurant but did not eat all of her lunch. At six o'clock she went to fulfill a previous engagement to bowl with a team, and after eating felt better. She had completed one game and a half of another and then walked to the rear of the bowling alley where her mother and husband were sitting. She was unable to talk. She went to the cloakroom and on the way lost consciousness. She vomited in the cloakroom and then became "stiff all over." She was taken to a hospital, suffering from a condition which left her paralyzed, the medical aspects of which we shall have occasion to discuss further.

Defendant in its brief states that it does not dispute that plaintiff's head was caught in the bus doors, although it seeks to qualify the admission by pointing to certain circumstances which it designates "suspicious." Its argument that the verdict is against the manifest weight of the evidence is based on the contention that the mechanical operation of the doors was such as to reduce to absurdity the possibility that any serious head injury could be received in the manner claimed, and that there was no causal connection be-

tween the injury received and plaintiff's ultimate condition of ill-being.

██ The fact that plaintiff made no instant complaint of injury and that there were no marks or bruises on her head is not conclusive of the fact that she received no injury. It is argued that because these collapsing sections of doors were cushioned with rubber the force of the blow to plaintiff's head was greatly diminished. Apparently the jury was not persuaded by the argument that such force could not have resulted in serious injury, and we think it was properly a question for the jury. In the recent case of *Free v. Chicago Motor Coach Co.*, 341 Ill. App. 552, an injury occurred as a result of the operation of a bus door, the construction and mechanical operation of which were·similar to that of the one in question. There plaintiff's coat was caught and held with such tenacity as to resist the weight of her body until she had been dragged some distance and seriously injured.

Whether or not the collapse of the doors on her head caused or proximately contributed to the subsequent paralysis was a matter upon which experts gave conflicting opinions. It is plaintiff's medical theory that the violence suffered by the closing of the doors on her head resulted in a cerebral hemorrhage which manifested itself in a lesion on the surface of the brain. Defendant's medical theory is that plaintiff suffered from a congenital weakness of the vessels conveying blood to and from the brain, medically termed an "aneurysm," an aneurysm being defined as a sac occurring in a weak spot of an artery. It theorizes that this aneurysm, predating the accident, was caused to rupture independent of the bus incident by the exertion incumbent upon the lifting and throwing of the bowling ball. Among medical authorities testifying were several with outstanding qualifications in the field of brain injuries.

On behalf of the plaintiff came Dr. Eric Oldberg, head of the Department of Neurology and Neurological Surgery at the University of Illinois, whom defendant describes in its brief as "one of the great brain surgeons in the country." Dr. Oldberg, at the request of plaintiff's family, was called for consultation at Edgewater Hospital on October 20, 1945, some 17 days after the injury. He testified that plaintiff had a partial paralysis on the entire right side of her body which was most marked in the arm and least marked in the leg; that she had a diminution in all forms of sensation on the entire right side of her body. Dr. Oldberg concluded that the bus accident could be sufficient from a medical standpoint to account for the subsequent paralysis. His opinion was influenced in part by the complaints of headache immediately after the accident, the difficulty in the use of her hands because of the inability to hold a coin or pencil without dropping them frequently, the presence of blood when a spinal puncture was done; but the principal basis for his opinion was the fact that his physical examination of the patient persuaded him that the hemorrhage was on the surface rather than at the base or within the brain itself. He found upon his physical examination that all fields of the patient's vision were normal; that is to say by closing one eye and looking directly ahead plaintiff, just as any normal person, could see four quadrants of vision all around the object. He stated that if the patient had an inability to see to the right side then the point at which the lesion had occurred would necessarily have been in the depths of the brain, and testified, "It is inconceivable that a lesion in the depths of the brain could have occurred and produced all these other things I have described without also wiping out the right side of the field of vision." He therefore ruled out a diagnosis of ruptured aneurysm or, as it is also known, "spontaneous hemorrhage," because, to

226

use his own words, "When hemorrhages occur spontaneously in the brain, they are usually at the base of the brain or in its substance, and not on the surface. . . . It is very, very uncommon; in fact, almost unheard of for a blood vessel to rupture out on the surface of the brain which is apparently where the rupture occurred in this case."

Dr. Joseph Luhan, chief of the neurological staff of the Cook County Hospital, President of the Chicago Neurological Society, and clinical professor of neurology and psychiatry of Stritch School of Medicine, Loyola University, substantially corroborates Dr. Oldberg. He stated that he had never found a ruptured aneurysm in the region where this lesion occurred, although he had examined 2,000 brains in connection with his services at Cook County Hospital.

Dr. Leo Kaplan, attending neurologist at Cook County Hospital and a Diplomat of the American Board of Neurology and Psychiatry, in answer to a hypothetical question, testified that in his opinion the injury sustained by the closing of the doors precipitated a hemorrhage into the left side of the brain with the resultant aphasia and paraylsis.

For the defense Dr. Maurice Mazel, proprietor, chief of the surgical staff and medical director of the Edgewater Hospital, where plaintiff was taken after she was stricken at the bowling alley, testified by way of deposition taken in Florida. He stated that in his opinion the exertion caused by bowling might or could have ruptured an aneurysm. He testified in this respect: "It could blow it out because an aneurysm or a diseased blood vessel, which is the same thing, except the aneurysm has a little pouch on it, on exertion, depending upon the degree of exertion, amount of pressure within the blood vessels, will blow it out." He testified further that he found no external signs of injury whatever while plaintiff was in the hospital and

that he would say she was not injured. He testified that an aneurysm could occur in any particular blood vessel of the brain.

Dr. Mazel was corroborated in substantial part by Dr. Howard Zeitlin, who at the time of the injury was connected with the Edgewater Hospital. He specializes in the practice of neuropsychiatry and is an assistant professor at the University of Illinois in the department of neurology. He stated that in his opinion trauma or external violence was no factor in the subsequent paralysis. He differed with Dr. Oldberg on the interpretation of the normality of the visual field of the right eye, stating: "The normality of the visual field of the right eye does not necessarily mean that the lesion is superficial"; that "aneurysms occur in all parts of the body. The most common cause of aneurysms in the brain is congenital. People are born that way, with defect"; that "in my opinion the cause of the hemorrhage in this particular area was due to a congenital aneurysm"; that "it would rupture if they threw a bowling ball."

██ ██ While the above is the barest outline of the lengthy and highly technical medical testimony, it is apparent that there was considerable conflict between the doctors, first as to where the lesion occurred, plaintiff's witnesses insisting that it was on the surface of the brain and defendant's that it was more probably at the base of the brain, and secondly as to the proper interpretation to be given the fact that the visual field of the patient was normal after the hemorrhage. The medical aspects of the case were certainly beyond the knowledge and experience of laymen. Understanding necessitated scientific training and experience. We think it was particularly within the province of the jury to decide the matter and we cannot say that their decision was against the manifest weight of the evidence.

██ Defendant maintains that the court erred in excluding evidence sought from three doctors from Edgewater Hospital as a "history" given by plaintiff's mother to the doctors. The plaintiff's medical history appearing in the hospital records, taken at the time she was brought to the hospital, was recorded by an intern at the hospital, Dr. Seymour Guten. He stated that he had obtained a history of what happened before plaintiff came to the hospital; that she was unconscious when he first saw her; that "I don't recall to whom I talked. I don't know whether I was given that history of the patient when I made my examination of her. It is marked October 4, 1945. That is not necessarily the date I wrote it out. . . . I took a history from somebody who brought her to the hospital as to how she happened to get in the hospital." There was no error in refusing to permit this witness to testify from this record as to the patient's medical history as it fell clearly within the prohibition of the hearsay rule.

Dr. Mazel was asked the following:

"Q. Did you get a history from the mother or somebody? A. I did.

"Q. Were you told anything about previous headaches by the mother? A. I believe the mother told me she had a headache several weeks prior to this episode."

This latter answer was stricken and defendant complains it was error under the rule announced in *Welter v. Bowman Dairy Co.*, 318 Ill. App. 305. In that case a history given by the mother as to complaints of her infant daughter allegedly resulting from drinking contaminated milk was admitted. This history was admitted because of the fact that the infant could not tell the physician what had happened and the doctors relied on information from the mother in order to make

a diagnosis. It was admitted apparently as the best evidence of which the case permitted. In the instant case, although the plaintiff was unable to speak at the time she was admitted to the hopsital, at the time of the trial and for a long time prior thereto she was able to describe her own physical condition prior to the time of the accident, and we do not believe that under the circumstances the testimony sought to be admitted comes within any exception to the hearsay rule. The ruling of the trial court was proper.

■ Dr. Zeitlin was asked a question as to the history of headaches appearing on the hospital record. We have already commented upon the competency of the hospital record, and we find no error in the ruling rejecting such testimony.

■ Defendant also complains of the exclusion of a statement of Dr. Mazel that the aneurysm about which he testified was produced by a congenital defect. While in several instances objection was sustained to the inquiry as to whether the aneurysm was congenital, in other parts of the testimony of both Dr. Mazel and Dr. Zeitlin this subject matter was fully covered. In any event, the defense was primarily concerned not with proving that this aneurysm was congenital, but that it existed prior to the time of the bus accident and that the rupture occurred independently of the bus accident. We think that the jury was fully informed as to defendant's medical theory and that no prejudicial error was committed in the exclusion of testimony.

■ ■ Further complaint is made of the fact that the court refused to admit in evidence a bowling ball of the type plaintiff admitted she used the night that she suffered the cerebral hemorrhage. This bowling ball, as to weight, diameter, use, and so forth, had been fully described to the jury. As a general rule the court has considerable discretion in the admission of demonstrative evidence. *Goodrich v. Chicago Great*

*Western Ry. Co.,* 148 Ill. App. 579; *Quincy Gas and Elec. Co. v. Baumann,* 203 Ill. 295. We find no abuse of discretion in the court's ruling in this respect.

██ ██ Complaint is made of the giving of plaintiff's instruction No. 12, which is as follows:

"If you find that the defendant was guilty of one or more of the acts of negligence as charged in plaintiff's Amended Complaint and that prior to and at the happening of the occurrence alleged in said Amended Complaint, plaintiff was in the exercise of ordinary care for her own safety, and if you further find that plaintiff was injured as a direct and proximate result of the said occurrence as alleged in said Amended Complaint, then you are instructed that the plaintiff is entitled to recover for the aggravation of a pre-existing ailment or condition to the extent that you may find such aggravation, if any, to be the natural and proximate result of the accident alleged in said Amended Complaint."

The objection to the instruction is not that it is an improper statement of law, but that it is an instruction having to do with special damages and that there should have been, and was not, an allegation of special damages in the pleadings, to justify giving such an instruction. It is also objected to on the grounds that there was no evidence offered to show that the accident aggravated a pre-existing condition. Defendant tendered an instruction which the court gave the jury, to the effect that the plaintiff could not recover for any damage which was not the proximate result of the accident and injuries sustained at the time of the accident, and that if she had any other disability which resulted from conditions existing prior to the accident and of which the accident was not a proximate cause, they should not allow her anything for such disability. We think both instructions were proper and properly

instructed the jury as to the law applicable to aggravation of pre-existing physical conditions. The complaint clearly set forth that plaintiff suffered injuries as a result of defendant's negligence. If the accident in question proximately caused injury to plaintiff, even though the damage would not have occurred except by virtue of a systemic weakness, such injury may be shown under such general allegations. Neither do we agree that there was no evidence to support this theory. It is true that plaintiff's medical theory was that the brain damage ensued independently of any ruptured aneurysm; however, the entire medical defense of defendant was predicated on the theory that it was so caused. The instruction charged the jury that even though they agreed with defendant's medical theory of ruptured aneurysm, plaintiff nevertheless was not remediless if the jury found that the blow on the head was the proximate cause of the ultimate brain damage. *Shoninger Co. v. Mann,* 219 Ill. 242, 247; *City of Chicago v. McLean,* 133 Ill. 148, 152; *Lake Shore & M. S. Ry. Co. v. Ward,* 135 Ill. 511, 518; *Chicago City Ry. Co. v. Cooney,* 196 Ill. 466; *B. & O. S. W. Ry. Co. v. Slanker,* 180 Ill. 357, 358.

 Defendant complains finally of the excessiveness of the verdict. The injuries sustained by this woman are serious and permanent. She suffered a complete paralysis of the right side of the body, including the right hand and right arm, as well as the facial muscles on the right side. She was unconscious for 4 or 5 days and after regaining consciousness was unable to speak, being able only to utter sounds for some days. She was confined to the hospital for a period of approximately 5 weeks, and at the time of her discharge in November was still unable to talk, other than to mutter a few words. She was confined to bed until the following March. She had no feeling in the right hand, no ability to identify objects with which

she came in contact, and had difficulty in holding anything in that hand. It was some 7 months later before she was able to go outside the home and she walked with a leg drag. In August of 1949 she was delivered of a child by means of Caesarean section, which abnormal delivery was necessitated by her condition. At the time of the trial there were occasions when she could talk and when she was unable to talk. She frequently slurs words and is unable to finish sentences. Her right hand and right arm are partially numb and she cannot lift anything heavy. She has to hold the hand in order to keep it from shaking, and when walking she drags the right leg at times. On occasion she drools and has no taste on the right side of her mouth, but must chew everything on the left side. She has difficulty in reading and cannot write in any way with her right hand, other than her signature. She has done no work since the accident. At the time of the accident she was 26 years of age. She had never been injured in any way and had none of the defects of which she now complains. There is ample testimony that her condition is permanent and that no further improvement in her condition as it existed at the trial is to be expected; in fact it is not seriously disputed. Under all the circumstances we are unable to say that the verdict of $47,500 is excessive.

The judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

SCHWARTZ and ROBSON, JJ., concur.