Bergman & Lefkow Insurance Agency, Plaintiff, v. Flash Cab Company and Public Taxi Service, Inc., Defendants.

Flash Cab Company and Public Taxi Service, Inc., Counterplaintiffs-Appellees, v. William B. Shapiro, Samuel N. Bergman, and Bergman & Lefkow Insurance Agency, Inc., Counterdefendants-Appellants.

Gen. No. 52,391.

First District, Fourth Division.

June 4, 1969.

416

417

Arvey, Hodes & Mantynband, of Chicago (J. Herzl Segal, Irwin I. Zatz and Malcolm S. Kamin, of counsel), for appellants.

Philip W. Tone and Donald R. Harris, of Chicago (Raymond, Mayer, Jenner & Block, of counsel), for appellees.

MR. JUSTICE McNAMARA delivered the opinion of the court.

Counterdefendants, William B. Shapiro, Samuel N. Bergman and Bergman and Lefkow Insurance Agency, Inc., appeal from judgments entered in favor of counter-

plaintiffs Flash Cab Company and Public Taxi Service, Inc. The counterclaim alleged, in effect, that counterdefendants had, through misrepresentations and failure to disclose pertinent facts, induced counterplaintiffs to place their insurance with a financially unsound company. After a jury trial on the counterclaim, judgment was entered in favor of Flash Cab in the amount of $44,657.18 and in favor of Public Taxi in the amount of $28,876.08. Counterdefendants appeal from those judgments and the denial of their post-trial motions, contending that the judgments should be reversed for the following reasons: (1) that there was a total absence of proof of any misrepresentation; (2) that there was no basis in the evidence for a finding that appellants had failed to disclose an interest in the insurance company they recommended to the cab companies; (3) that because of the lack of privity between the parties the cab companies had no standing to sue; (4) that the cab companies dealt with Shapiro as a principal on his own behalf, and not as an agent for the other appellants; (5) that Bergman and Lefkow Insurance Agency, Inc. was not in existence at the time of the purported misrepresentation and therefore could not be liable. In the alternative, appellants contend that the cause should be remanded for a new trial because the trial court erred in admitting certain evidence; that the trial court erred in the giving of a certain instruction to the jury; that the verdict was against the manifest weight of the evidence; and that, assuming appellants would be liable, they are entitled to certain offsets against the judgments.

Flash Cab Company and Public Taxi Service, Inc. are Illinois Corporations. Arthur Dickholtz owns and is president of Flash Cab, and is the major shareholder of Public Taxi.

From 1959 until June 24, 1961, Shapiro was an employee of Berkow Corporation and Bergman and Lefkow

Insurance Agency, Inc., and a vice-president of Bergman Exchange Agency, Inc. From June 24, 1961 until 1965, he was vice-president of Bergman and Lefkow Insurance Agency, Inc. From 1959 Bergman was president of these various companies.

Bergman and Lefkow Insurance Agency, Inc. was incorporated in Illinois on June 24, 1961. Shortly thereafter, it purchased substantially all of the stock of Bergman and Lefkow Insurance Service, Inc., Berkow Corporation, Bergman Exchange Agency, Inc., and Bergman Exchange Agency, Inc. of Miami. Bergman and his wife were the old companies' shareholders who sold their interests to the new corporation. All of these corporations were located in one office in Chicago, and Bergman and Shapiro sold insurance through all of them. Dickholtz and Shapiro had known each other for several years. Shapiro had been engaged primarily in cab insurance, and Dickholtz had purchased insurance from him on several occasions. From 1956 to 1959, Dickholtz purchased the cab company insurance from an insurance company which then went into liquidation. In November, 1959, Dickholtz had a conversation with Shapiro in which he said that his insurance carrier had just gone into liquidation and that he would like to get into a program whereby the cab companies could control their claims. Shapiro stated that he could not make a definite proposal, but would check with his office. In the early part of 1960, as the result of a proposal made by Shapiro, Dickholtz met with Shapiro and Bergman in their office, but rejected a proposed arrangement because of his inability to make a necessary deposit. In October, 1960, Shapiro advised Dickholtz that a suitable arrangement could be worked out with Exchange Casualty and Surety Co., a company that Bergman and he had formerly owned. Dickholtz testified that Shapiro informed him that only he could put this deal together because of his former affiliation with the company. He

420

further testified that he agreed to pay Shapiro $50 per week if the arrangement were to materialize, and that he believed that Exchange would also pay him a commission. Dickholtz told Shapiro that, because of his previous unfavorable experience with insurance, he had to be careful in selecting an insurance program for the cab companies. Dickholtz testified that, while discussing Exchange's proposal with Shapiro,

> ". . . he advised me that the company was financially sound and I should have no qualms whatsoever about the capabilities of the company in carrying this risk, and that he was recommending the company, and that I should rely entirely upon his vast knowledge in this matter, having been a former officer of the company and a previous owner."

A memorandum of this meeting was prepared by Dickholtz and was introduced into evidence. This memorandum indicated that the weekly payment to Shapiro was for consulting services. Shapiro testified that he consulted with Dickholtz regarding claims about approximately eight times, each discussion taking no more than 45 minutes.

On November 8, 1960, Shapiro, Dickholtz and two representatives of Exchange met, and on the following day Shapiro notified Dickholtz by mail that an agreement may have been reached. That letter was written on Bergman and Lefkow Insurance Agency stationery and was signed "Bergman and Lefkow Insurance Agency, W. B. Shapiro."

After a series of meetings and conversations, a final agreement was reached on January 1, 1961. The agreement authorized Dickholtz to solicit applications for insurance and to issue and countersign insurance policies. He was to retain 29 percent of the premiums as commission and for fees and expenses. Policies for cabs operated by both cab companies, countersigned by Dickholtz as authorized agent for Exchange, were issued.

421

The net premiums collected, after the 29 percent deductions, were deposited to the premium account of Exchange. The commission was retained by Flash Cab, and the fees were kept in a personal account of Dickholtz known as the Taxi Drivers Emergency Fund. All claims arising out of the operations of the cabs were disposed of by Dickholtz or the cab companies. The claims were paid out of the Emergency Fund, and were then deducted from premiums due on a monthly basis. The weekly payments to Shapiro were made from this fund.

In March, 1962, Dickholtz was informed by Exchange and by the Illinois Director of Insurance that Exchange's license had been revoked by the Michigan Insurance Department. Exchange also informed him that all agents' licenses were cancelled. After he was notified that Exchange had been placed in receivership, Dickholtz contacted Shapiro and asked, "What is Bergman and Lefkow going to do about this?" Shapiro replied that he would talk to Bergman and advise Dickholtz of their decision. Shapiro subsequently informed Dickholtz that Bergman had stated that he was going to back up the claims of the older office clients, but that Flash Cab was on its own.

The net premium paid to Exchange during the insured period was $241,301.03. Testimony for the cab companies indicated that $60,255.66 was retained as commission, while testimony for appellants indicated that the commission amounted to $68,141.14.

Exchange was owned by a holding company, Exchange Management Company, until May 15, 1959. Bergman was president of both companies; Shapiro was secretary-treasurer of the insurance company and vice-president of the holding company. On May 15, 1959, the holding company sold Exchange to Donald Elbel for $160,000. In addition Elbel agreed to pay the holding company one-half of the saving, if any, of loss and loss expense

reserves of Exchange upon liquidation of the same. A final settlement of the additional consideration was to be had on June 30, 1960, but no saving was realized. After the sale to Elbel, Shapiro became vice-president of Exchange and served until March 9, 1960.

Paul Plesko, a certified public accountant, testified as an expert witness for the cab companies as to the financial conditions of Exchange. He had examined the annual reports of the company filed with the Director of the Illinois Department of Insurance for the years 1957 through 1961. According to his testimony, Exchange suffered a loss from operations in 1957, 1958 and 1959. Policyholders' surplus was $702,667 at the end of 1957; $518,601 at the end of 1958; and $439,748 at the end of 1959. During 1958, shareholders contributed assets valued at $150,000, and in 1959 they contributed assets valued at $740,000. Of this latter contribution, $315,000 consisted of stock not listed on any exchange or in any over-the-counter list. Plesko testified that Exchange would have been insolvent except for these contributions. Loss reserves for the three years were substantially below actual loss experience; the companies' liquid assets declined about one-half; and total assets also declined.

The cab companies also attempted to introduce testimony from Plesko concerning the financial condition of Exchange as of December 31, 1960, as reflected in its annual report filed in March, 1961. Appellants objected to the testimony on the grounds that it was irrelevant and the objection was sustained. However the 1960 and 1961 annual reports were admitted into evidence. These reports indicated on their face that the company's liquid assets and its ratio of liquid assets to total assets continued to decline in 1960, while the percentage deficiency in the reported reserves continued to increase. There was also a further decline in the ratio of liquid assets to total loss reserves in 1960.

In March 1959, prior to the sale to Elbel, Exchange ceased writing new business and did not resume until October 1959.

The jury returned a verdict for the amounts paid out by the cab companies in settlement of accident claims which they assumed after Exchange's failure, and fees and expenses incurred in the defense of these claims.

Appellants first contend that there was a total absence of proof of any misrepresentations, arguing under this heading that the statements made by Shapiro were merely nonactionable opinions and not statements of fact; that there was no evidence in the record as to the financial condition of Exchange in October 1960; and that the statements were not false since Exchange was solvent in October 1960.

In Buttitta v. Lawrence, 346 Ill 164, 178 NE 390 (1931), the court held that whether a statement is an affirmation of fact or of opinion depends upon the circumstances of the case. The court stated at page 173:

> "Wherever a party states a matter which might otherwise be only an opinion but does not state it as the expression of the opinion of his own but as an affirmative fact material to the transaction, so that the other party may reasonably treat it as a fact and rely upon it as such, then the statement clearly becomes an affirmation of the fact within the meaning of the rule against fraudulent misrepresentation."

In Endsley v. Johns, 120 Ill 469, 12 NE 247 (1887), plaintiff was selling cattle and was told by defendant that the prospective buyer was solvent and that his check would be honored. This proved not to be the case, and suit was filed by the seller. After a trial, judgment was entered for plaintiff against the third party making the assertion. In affirming the judgment, the court found that while false assertions as to value between vendor

and vendee are not actionable since in such cases the parties' interests are antagonistic and consequently they should be on guard, the rule is different where a third party without interest in the matter makes a representation as to the credit, solvency or reliability of another. At page 481, the court went on to say that in such instances:

> "The position of the parties is not antagonistic,—rather one of confidence. In such case, if the material representation is knowingly falsely made to one ignorant of its falseness, under circumstances justifying a reasonably prudent man's belief, and it is believed and acted upon with consequent injury, an action therefor will lie; . . . ."

 In applying these general rules to the evidence in the instant case, we find that there was sufficient evidence for the jury to reasonably conclude that Shapiro's statements constituted representations as to material facts upon which the cab companies were entitled to rely. He stated that Exchange was "financially sound." He told Dickholtz that he should "have no qualms whatsoever about the capabilities" of Exchange to carry the risk. As a former officer, he stated that he had "vast knowledge" of the company, and informed Dickholtz that he could rely entirely on that knowledge. These statements constituted matters of fact made by a person who represented himself as having a special knowledge of those facts.

The case cited by appellants as controlling, Fetherston v. National Republic Bancorporation, 280 Ill App 151 (1935), is clearly distinguishable from the instant case. In that case an action in fraud and deceit was brought based upon advertisements and upon a letter written in June, 1931 by the president of the defendant corporation to various bank presidents, in which he described certain banks, including the one in question, as being

sound, strong and liquid; and that these banks had proved their soundness by their ability to meet the tests brought by present economic conditions. The bank in question closed in June, 1932. In affirming the dismissal of the complaint, the court pointed out that the letter was merely one of encouragement and could not have been expected to forecast the severe financial crisis ahead. The statements by Shapiro cannot be categorized as words of encouragement. They were statements of fact, and moreover he expressly assured Dickholtz that he could rely on them.

█ Appellants also contend that the record is devoid of any evidence of Exchange's financial condition in October 1960, the time at which Shapiro made his statements. They base this argument on the fact that the trial court sustained their objection to the expert testimony of the accountant Plesko as to the year 1960. Without considering the cab companies' argument that appellants cannot rely on the absence of proof which was excluded on their own objection, we find that there was ample evidence in the record as to Exchange's financial condition in October 1960. The testimony of the accountant revealed that Exchange was in a precarious financial condition at the end of 1959. The policyholders' surplus had been reduced to about $440,000, and would have vanished entirely except for capital contributions of nearly $900,000 in the years 1958 and 1959, one-third of which consisted of unmarketable securities. In addition, despite the fact that the expert testimony concerning 1960 was excluded from the jury's consideration, Exchange's annual reports for the years 1960 and 1961 were admitted into evidence. These reports on their face revealed a continuation of the financial deterioration of the company, and indicated a sharp decline in liquid assets and a further decline in the relationship of liquid assets to total loss reserves as compared with the 1958 and 1959 reports.

Merely because Exchange was solvent in October 1960 at the time of Shapiro's statements did not establish the truth of Shapiro's representations. He did not state that the company was solvent. He described it as financially sound at a time when except for capital contributions, it would have been insolvent. He assured Dickholtz that he should have no worry about the ability of Exchange to carry the risk when the evidence showed that during the previous year while he was an officer, the company had been forced to stop writing new business for several months. Moreover he made these statements with full knowledge of the cab companies' previous unfortunate experience with an insurance company, and of Dickholtz' concern with associating the cab companies with a sound insurance company.

We agree with appellants' next contention that there was no evidence in the record that they failed to disclose retention of a financial interest in Exchange at the time of Shapiro's statements, as Shapiro and Bergman had sold their interest in Exchange in May, 1959. While it is true that in addition to the sales price, the parties agreed that the purchaser would pay Shapiro and Bergman one-half of the savings, if any, on the loss and loss expense reserve of Exchange, the contract clearly provided that this possibility of a supplemental interest to the sellers would be totally extinguished on June 30, 1960, four months prior to Shapiro's representations to Dickholtz. Since the evidence also shows that Shapiro described himself as a former officer and owner of the company, it is evident that there was no concealment of any present interest in Exchange. However, the cab companies submitted two issue instructions which presented two grounds of recovery, both of which were given to the jury: (1) that appellants knowingly misrepresented material facts concerning the financial condition of Exchange; (2) that appellants failed to disclose that they retained an interest in Exchange. Objection

427

was made to the 'misrepresentation' instruction, but no objection was made to the 'failure to disclose' instruction. Further no motion was made to withdraw either issue from the jury. Section 68(4) of the Civil Practice Act provides as follows:

> If several grounds of recovery are pleaded in support of the same demand, whether in the same or different counts, an entire verdict rendered for that demand shall not be set aside or reversed for the reason that any ground is defective, if one or more of the grounds is sufficient to sustain the verdict; nor shall the verdict be set aside or reversed for the reason that the evidence in support of any ground is insufficient to sustain a recovery thereon, unless before the case was submitted to the jury a motion was made to withdraw that ground from the jury on account of insufficient evidence. . . . (Ill Rev Stats, c 110, § 68(4) (1967).)

 There was neither a motion to withdraw the issue from the jury nor an objection to the instruction covering the failure to disclose. Consequently the verdict of the jury cannot now be set aside, since, as we have noted, there was ample evidence presented to support the jury's verdict on the issue of misrepresentation. See Darling v. Charleston Community Memorial Hospital, 33 Ill2d 326, 211 NE2d 253 (1965).

 We find no merit in appellants' contention that the action must fail because of a lack of privity between them and the cab companies. A cause of action for misrepresentation does not depend upon a contractual relationship. In such actions it is not necessary to show any privity of contract between the parties. Weatherford v. Fishback, 4 Ill 171 (1841); Bauman v. Bowles, 51 Ill 380 (1869). Nor is it essential to show that the party making the misrepresentation had any interest in the subject matter or received any benefit therefrom. Leon-

ard v. Springer, 197 Ill 532, 64 NE 299 (1902). The essentials of such an action are that there be a misrepresentation of a material fact, with either knowledge of its falsity or a reckless disregard for its truth or falsity, to a party with the intention that he rely on it, and that the believing party does so rely, with resultant damages. Edwards v. Chicago & N. W. Ry. Co., 79 Ill App2d 48, 223 NE2d 163 (1967). Shapiro made misrepresentations to Dickholtz, the president and chief shareholder of the cab companies who at the time was acting on behalf of the cab companies in seeking a sound insurance relationship for those companies. That fact is not altered because, subsequent to the misrepresentations, Dickholtz became an agent for Exchange in the writing of policies, or by reason of Dickholtz's agreement to pay Shapiro $50 per week out of a claim fund.

Cases relied on by appellants are clearly distinguishable from the case at bar. In National Iron & Steel Co. v. Hunt, 312 Ill 245, 143 NE 833 (1924), the court found that there was no liability because the misrepresentations contained in a report issued by defendants was made to a third party, and not to plaintiffs. Further, the report was issued prior to any contact between plaintiffs and defendants. In Aetna Ins. Co. v. Illinois Cent. R. Co., 365 Ill 303, 6 NE2d 189 (1937), plaintiff brought suit against a carrier for having negligently lost a mail pouch, the court found that the carrier's duty was dependent upon a contract and held that since plaintiff was not a party to that contract, it could not recover.

■ ■ Appellants also argue that Dickholtz's failure to make an independent investigation of the financial condition of Exchange constituted negligence, and thus absolved appellants from liability. The rule is that negligence on the part of a defrauded party does not bar his right of recovery from a person who intentionally misrepresented facts upon which the defrauded party had a right to rely. Peterson v. Yacktman, 25 Ill App2d 208, 166

NE2d 452 (1960). Moreover, since Dickholtz was dealing with a former officer and owner of Exchange who held himself out as having special knowledge of that company's financial soundness, he was justified in relying completely on Shapiro's representations.

Appellants next contend that Shapiro was acting as a principal on his own behalf and not as agent for the other appellants. The first issue to be determined under this contention is whether there is sufficient evidence to support a finding that Bergman is individually liable. The cab companies contend that the evidence proves that Shapiro was acting on behalf of Bergman.

 One who permits the holding out of another as his partner is estopped to deny the partnership relationship as against third persons who rely on the existence of the apparent partnership. Reynolds v. Radke, 112 Ill App 575 (1903).

 Shapiro held himself out to be a partner with Bergman, and informed Dickholtz that he was a partner. In discussing one possible insurance arrangement, Dickholtz met with both Shapiro and Bergman in their offices. Subsequently, after Dickholtz had met with Shapiro and representatives of Exchange, Shapiro wrote Dickholtz on Bergman and Lefkow Insurance Agency stationery with both Shapiro and Bergman's names on the letterhead. This letter indicated that it appeared that a deal could be worked out and was signed "Bergman and Lefkow Insurance Agency—W. B. Shapiro." However, the strongest evidence that Shapiro was also acting on behalf of Bergman was the uncontradicted testimony of Dickholtz that upon his notification that Exchange had been placed in receivership, he called to find out what would be done. Shapiro replied that he did not know how Bergman would consider it, but that he would inform Dickholtz. He later informed Dickholtz that Bergman was going to protect the older office clients, but that Flash would not be so considered. The jury was properly

instructed as to the definition of agency and the scope of an agent's authority, and we find that the evidence supported its finding against Bergman individually.

Appellants urge that Bergman and Lefkow Insurance Agency, Inc. could not be bound by any misrepresentations made by Shapiro in October 1960, because it was not incorporated until June 24, 1961, and therefore was not in existence at the time the statements were made. Appellees contend that it should be liable because it is merely a continuation of the old corporations.

In Loughlin v. United States School Furniture Co., 118 Ill App 36 (1905), affirmed, Perry v. United States School Furniture Co., 232 Ill 101, 83 NE 444 (1908) the court stated at page 39:

> "If the officers or stockholders of a corporation form another corporation and transfer the good will, business and assets of the old corporation to the new without paying the just debts of the old corporation, equity will follow such property into the new corporation and subject it to the payment of such debts the same as though no transfer had been made."

Accord, Kraft v. Garfield Park Community Hospital, 296 Ill App 613, 16 NE2d 936 (1938). In Plaza Express Co. v. Middle States Motor Freight, Inc., 40 Ill App2d 117, 189 NE2d 382 (1963), this court extended the liability of a new corporation to include, in certain instances, the old corporation's liability for torts, stating at page 124–5:

> ". . . liability founded on a tort, like any other liability, may be impliedly assumed by a new corporation which represents only a 'new coat' for its old owners."

 There was sufficient evidence to support the conclusion that Bergman and Lefkow Insurance Agency, Inc. was merely a continuation of the dissolved com-

panies. The prior companies had all been located in one office, and all were engaged in the same business. When they were dissolved, the new corporation continued to operate the same business. Bergman, who had been an officer in all of the prior companies, and Shapiro, who had been an officer in one of the prior companies, both continued as officers in the new corporation. Bergman and his wife were the shareholders selling their interests in the dissolved companies to the new corporation for cash. And again it should be noted that when Dickholtz called Shapiro to ask what "Bergman and Lefkow were going to do" about Exchange's failure, he was informed by Shapiro, after a conference with Bergman, that they were going to take care of the older office clients. This clearly revealed that the officers themselves considered the new corporation merely a continuance of the old companies.

■■■ Appellants further request that if the judgments are not reversed outright, that the cause be remanded for a new trial, first arguing that the court erred in allowing into evidence the contract of sale between Exchange and Donald Elbel. Although we have found that the appellants did not conceal an interest in Exchange, the contract of sale was properly introduced in evidence to show that at the time of the sale, May 15, 1959, appellants knew of the poor financial condition of Exchange, since despite the fact that the company's books reflected a net worth of about $350,000, the sale price was only $160,000.

■■■ Appellants also urge that the trial court erred by allowing into evidence Exchange's annual statements for the years 1957 through 1959. However these statements were relevant to show the continual decline in Exchange's financial position and to also show that Shapiro's representations were false.

■■■ We also find that the trial court did not err in allowing into evidence the schedules prepared by the

432

cab companies' expert. These schedules summarized the information contained in the annual statements for 1957 through 1959. An interpretation of financial data by a qualified witness is admissible. People v. Cowgill, 334 Ill 635, 166 NE 535 (1929). And the use of exhibits and diagrams during trial is within the discretion of the trial court. Behles v. Chicago Transit Authority, 346 Ill App 220, 104 NE2d 635 (1952).

 The appellants further contend that the court erred in giving the counterplaintiffs' instruction No. 12, the issues instruction covering misrepresentation. Their objection to the instruction at trial and in the post-trial motion was that there was no evidence of misrepresentation. As we have noted, there was ample evidence of misrepresentation, and the giving of the instruction was proper. The jury was properly instructed; no prejudicial error occurred in the admission of evidence; and the verdict was not against the manifest weight of evidence.

Appellants finally argue that if the judgments are affirmed they are entitled to offsets against those judgments for the reasonable value of services rendered. They contend that the reasonable value of such services is the total commission paid, a sum amounting to over $60,000.

At the close of the trial, appellants contended that they were entitled to argue to the jury the deductibility of the amount of the commission paid. The trial court ruled that they could not so argue; and instructed the jury that the cab companies' damages were not to be reduced by the commissions deducted from gross premiums.

 We believe that the trial court ruled correctly in the giving of the foregoing instruction. We also agree with the cab companies that the position of the appellants in claiming these commissions as offsets is untenable.

The record is completely devoid of any evidence tending to indicate that the cab companies promised, explicitly or implicitly, to pay appellants any more than $50 per

week paid to Shapiro from the Taxi Drivers' Emergency Fund. The contract between Exchange and the cab companies, of which appellants had notice, expressly provided that Dickholtz would get the commission. And until the conference on instructions at this trial, appellant had made no demand for additional payment for services rendered.

The memorandum introduced into evidence indicated that Shapiro was to receive payment as a claims consultant. However, the evidence revealed that Shapiro spent no more than six hours discussing claims with Dickholtz. Further Dickholtz testified that this $50 per week payment was made because only Shapiro, by virtue of his affiliation with Exchange, could make the arrangement. He also testified that he believed Exchange would pay Shapiro an additional commission.

Whether the consideration was the total of $2,400 actually paid, or whether appellants were hoping for additional business from the cab companies, is immaterial. There was no promise of any additional payment, and appellants are not entitled to offsets.

The judgments of the Circuit Court are affirmed.

Judgments affirmed.

ENGLISH and STAMOS, JJ., concur.