ROGER FICKEN, Plaintiff-Appellant, v. ALTON AND SOUTHERN RAIL-
WAY COMPANY, Defendant-Appellee.

Fifth District   No. 5—91—0513

Opinion filed December 30, 1993.

1048

Jon G. Carlson, of Edwardsville, for appellant.

Thomas E. Jones and Leslie G. Offergeld, both of Walker & Williams, P.C., of Belleville, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiff, Roger Ficken, appeals from the judgment of the circuit court of Madison County entered after the jury returned a general verdict in favor of defendant, Alton & Southern Railroad Company, in this action brought under the Federal Employers' Liability Act (FELA) (45 U.S.C.A. §51 *et seq.* (1986)). In this cause, plaintiff raises two issues: (1) whether the jury verdict was against the manifest weight of the evidence, and (2) whether numerous rulings of the trial court, either individually or collectively, resulted in a denial of plaintiff's right to a fair trial as guaranteed under the FELA. We reverse and remand for a new trial.

## I

We will relate only those facts necessary for an understanding of our determination in this case. Plaintiff was employed as a switchman by defendant. Early in March 1989, plaintiff was injured while performing a "trimming" operation, which involves closing the gaps between cars on a track to make room for additional cars. The trim job is done in the bowl yard, an area where the track dips in the middle and is higher at the two ends. The cars are shoved from the east end to the west end of the track. During a trimming maneuver, the switchman looks down the tracks to determine where the gaps are located and then gives the conductor an appropriate sign with his lamp. On the night in question, plaintiff looked down the track and saw three gaps. Plaintiff was standing on the steps of the engine hanging on with one hand and signaled to the engineer to shove until he believed the gaps were closed. Plaintiff was just about ready to signal for the engineer to stop when the train hit another group of cars he had not seen and did not anticipate. During a trimming maneuver there is a jarring which results when the cars hit together and, if impact is not anticipated, one can receive a jolt.

Plaintiff and five other railroad employees all testified that they were uncomfortable performing the trim job because it involved "shoving in the blind." This means that one never knows how far he is going to go before he hits another car. Plaintiff and his witnesses all felt more comfortable when there was a "bull ring man" on the job at the west end of the track. The bull ring man would position himself in the west end of the bull yard and communicate with the trim crew via walkie-talkie. He would tell the switchman how far he could drift before coming in contact with the next car. The bull ring man's main function was to keep the cars on the west end of the track from running out to the lead track. The bull ring position had been eliminated by defendant sometime in the early 1980's.

Plaintiff and his witnesses all testified that they would be more comfortable coupling each individual car rather than letting the cars drift down the bull yard. When coupling, each gap is closed one at a time until the train comes to the point. There is always a switchman on the ground next to the car to be coupled giving directions to the engineer to slow down or stop.

Floyd Cooper, defendant's superintendent, was called as an adverse witness. He disagreed that the crews were "shoving in the blind" on the trim job. He also stated that it was not the duty of the bull ring man to walk the track for a train crew or tell the crew

where the gaps were located. Those duties were to be performed by the groundmen. Cooper could not remember receiving any complaints concerning the method employed in performing the trim job. Plaintiff attempted to introduce documents to impeach Cooper on this point. The trial court denied plaintiff's request to introduce these documents, finding them to be irrelevant to the issues and/or hearsay. We will discuss these documents, namely the "Bruner" and the "Heath" documents, later in this opinion.

While performing the trimming incident in question, plaintiff twisted around approximately 180 degrees and slammed into the front of the engine when the unanticipated impact occurred. Plaintiff had the wind knocked out of him and experienced pain in his rib cage and lower back. He immediately told the conductor about the incident. Plaintiff continued to work for a number of hours until the pain in his rib cage got so severe that he asked the conductor if someone could take him to the hospital. He received nonnarcotic pain killers in the emergency room. Plaintiff used those until they ran out, and then he just kept working through the pain. Approximately three weeks after the incident, on March 29, 1989, plaintiff sought treatment from a chiropractor, Dr. Timothy Hackney, who had treated him for prior back injuries. Plaintiff advised defendant, through Floyd Cooper, superintendent of the railroad, that he was seeing a chiropractor. Cooper then advised defendant to see the company doctor. The company doctor took X rays, instructed plaintiff not to work anymore, and recommended plaintiff see Dr. Syed Ali, a neurologist. Plaintiff sought treatment from Dr. Ali and, at the time of the trial, was still under treatment with Dr. Ali and his partner, Dr. Riaz Naseer.

Dr. Ali testified that he first saw plaintiff on April 6, 1989. Dr. Ali diagnosed plaintiff as suffering from lumbar radiculopathy. Radiculopathy essentially means nerve root irritation. Dr. Ali performed a myelogram on plaintiff. It "revealed a disc herniation lateralizing to the left side at the L4-L5 level." Dr. Ali opined that the fact plaintiff was able to return to work after previous injuries meant that any previous inflammation of the nerve root had healed itself. Dr. Ali further opined, based upon a reasonable degree of medical certainty, that plaintiff's lumbar radiculopathy was a direct result of the injuries he sustained during the accident in question. Dr. Ali further opined that plaintiff's physical condition, even after surgery, would continue to cause him pain and suffering in the future as it had in the past. Dr. Ali testified that plaintiff should not participate in heavy industrial labor, such as a switchman's position, and concluded plaintiff was physically disabled.

Defense counsel objected to any testimony by Dr. Ali concerning Dr. Ali's examination of plaintiff the morning Dr. Ali was to testify. The trial court sustained defendant's objection. In addition, the trial court would not allow Dr. Ali to testify about any examination after July 1989, since Dr. Ali's partner, Dr. Naseer, had performed all examinations taking place after that date. The trial court stated that such testimony would be inadmissible hearsay.

Plaintiff also sought treatment with Dr. George Schoedinger, an orthopedic surgeon. Plaintiff's first visit with Dr. Schoedinger was on May 30, 1989. Dr. Schoedinger advised against engaging in "heavy industrial activity and specifically railroad work." Ultimately, Dr. Schoedinger found a disc rupture at the L4-L5 level and on October 11, 1990, performed a lumbar discectomy. After reviewing plaintiff's history of prior back trouble, Dr. Schoedinger testified that plaintiff's symptoms began prior to the March 1989 incident and, therefore, the March 1989 incident was "an aggravation of a pre-existing difficulty." Dr. Schoedinger opined that it would not be in plaintiff's best interest to resume heavy industrial activity. Plaintiff had suffered a permanent injury to his disc and would be subject to reinjury in the future.

As indicated, plaintiff had a previous history of back trouble. In the early 1980's, plaintiff was furloughed from the railroad. During that time, plaintiff worked for another company and during that employment twice injured his back. The first time plaintiff hurt his back lifting a metal grate and was off work for approximately one month. The second injury occurred when plaintiff was pulling up a hose and it got stuck. Plaintiff was off work for a few months because of that injury. In August 1986, plaintiff injured his back after lifting a picnic table. In November 1986, plaintiff injured his back while straightening out a draw bar. After this fourth injury, plaintiff was called back to the railroad, took a reemployment physical examination, given by defendant, and passed.

During the jury instruction conference, plaintiff tendered Illinois Pattern Jury Instructions, Civil, No. 30.01 (3d ed. 1989) (hereinafter IPI Civil 3d), the pattern jury instruction relating to damages for the aggravation of a preexisting condition. The trial court, *sua sponte*, refused to give the instruction which contained IPI Civil 3d No. 30.03 on the grounds that the aggravation of a preexisting condition is not a separate element of damages. Ultimately, a general verdict in favor of defendant and against plaintiff was returned, and judgment was entered thereon.

## II

Plaintiff raises numerous allegations of error which he argues either individually or collectively resulted in his being denied a fair trial. We agree with plaintiff that the cumulation of the following errors denied him a fair trial.

First, plaintiff contends the trial court erred in refusing to give IPI Civil 3d No. 30.03, as part of IPI Civil 3d No. 30.01, instructing the jury that a proper element of damage is "the aggravation of any pre-existing ailment or condition." Defendant replies that "the jury instructions given on the aggravation of a pre-existing condition fairly and fully apprised the jury of plaintiff's theory of damages and any error in giving the damage instructions complained of did not affect the jury's decision on the issue of liability." We find that the trial court erred in refusing to give IPI Civil 3d No. 30.03.

IPI Civil 3d No. 30.03 simply reads:

"30.03 Measure of Damages—Aggravation of Pre-Existing Ailment or Condition

The aggravation of any pre-existing ailment or condition." (IPI Civil 3d No. 30.03.)

The Notes on Use following the instruction state:

"This element is to be inserted between the two paragraphs of IPI 30.01 when the evidence justifies its use." (IPI Civil 3d No. 30.03, Notes on Use.)

The comment on this damage instruction states:

"An aggravation of a pre-existing ailment or condition has been recognized as a separate element of compensable damages in Illinois." (IPI Civil 3d No. 30.03, Comment.)

It then cites *Behles v. Chicago Transit Authority* (1952), 346 Ill. App. 220, 231, 104 N.E.2d 635, 640.

The trial court refused to give IPI Civil 3d No. 30.03 as part of IPI Civil 3d No. 30.01, which was to be part of plaintiff's number 18-A. The trial court, acting *sua sponte*, stated:

"THE COURT: *** The Court objects to this instruction and refuses to give it.

[Plaintiff's attorney]: Why?

THE COURT: Because the aggravation of any preexisting ailment or condition is not a separate element of damage.

[Plaintiff's attorney]: It is in the I.P.I.

THE COURT: The I.P.I. is wrong. Let me explain this to you.

[Plaintiff's attorney]: I understand.

THE COURT: This instruction should read—see, you need to get a new book. I think even in the new book, but I mean the preamble is wrong. You've left out nature, extent and nature of the injury. They took it out as an element of damage, but it's something they should consider. The way this should read is that you must then fix the amount of money which will reasonably—fix the amount of money which will reasonably and fairly compensate him for any of the following elements of damage, and then it says something like including the nature, extent and duration thereof, and you may further take into consideration the aggravation of any preexisting ailment or cannot proved [*sic*] by the evidence to result in [*sic*] the negligence of the defendant, and then you list them. But what this does is you get compensated for the disability and for the pain and suffering of the aggravated injury. You don't get compensated because your injury was aggravated, that's not a separate element of damage, and the I.P.I. is just wrong, the new one is wrong.

[Plaintiff's attorney]: It doesn't say anything in the preamble about the aggravation.

THE COURT: I know. The I.P.I. I said is wrong.

\* \* \*

THE COURT: You still get compensated for the pain and suffering, you get compensated for the disability, and because you had an old injury you get a separate blank for damages? I won't give it. It's wrong.

[Plaintiff's attorney]: Can you show it's over my—

THE COURT: Absolutely you can take it on appeal. There needs to be an Appellate Court decision. I've been ranting and raving for two years now. I've never given it and I wouldn't give it. It's not a separate element of damage. You put in the preamble they may take into consideration the aggravation of any preexisting, but the elements are still the same elements."

In place of the IPI instruction tendered by plaintiff, the court gave the following instruction:

"If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate him for any of the following elements of damages proved by the evidence to have resulted from the negligence of the defendant, taking into consideration the nature, extent and duration of the injury and taking into consideration the aggravation of any pre-existing ailment or condition.

(a) The disability resulting from the injury.

(b) The pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injuries.

(c) The value of earnings lost and the present cash value of the earnings reasonably certain to be lost in the future.

Whether any of these elements of damages was proved by the evidence is for you to determine."

The trial court also gave IPI Civil 3d No. 30.21, which reads:

"30.21 Measure of Damages—Personal Injury—Aggravation of Pre-Existing Condition—No Limitations

If you decide for the plaintiff on the question of liability, you may not deny or limit the plaintiff's right to damages resulting from this occurrence because any injury resulted from an aggravation of a pre-existing condition or a pre-existing condition which rendered the plaintiff more susceptible to injury." (IPI Civil 3d No. 30.21.)

IPI Civil 3d No. 30.21 is a new instruction. The Notes on Use instruct a court to give IPI Civil 3d No. 30.21 whenever IPI Civil 3d No. 30.03 is given. IPI Civil 3d No. 30.21 is a direct result of our supreme court's decision in *Balestri v. Terminal Freight Cooperative Association* (1979), 76 Ill. 2d 451, 394 N.E.2d 391, in which it was determined that IPI Civil No. 30.01, even with the inclusion of IPI Civil No. 30.03, did not adequately instruct the jury on the issue of aggravation of a preexisting condition.

Supreme Court Rule 239 instructs a trial court to use IPI instructions when applicable:

"Rule 239. Instructions

(a) Use of IPI Instruction; Requirements of Other Instructions. Whenever Illinois Pattern Jury Instructions (IPI) contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law." (134 Ill. 2d R. 239.)

In the instant case, plaintiff's testimony showed that he had suffered back injuries on four separate previous occasions, the last one being in November 1986. However, plaintiff received a reemployment physical in December 1986. He passed that physical and was allowed to return to work. According to Dr. Schoedinger's testimony, plaintiff's injury constituted an aggravation of a preexisting condition. Under the facts presented, we cannot agree with defendant that the instructions

as a whole fairly and fully advised the jury as to the issue of aggravation of a preexisting condition.

■■ The law is clear that a tortfeasor is liable for injuries he causes, including the aggravation of any preexisting condition. (*Balestri v. Terminal Freight Cooperative Association* (1979), 76 Ill. 2d 451, 394 N.E.2d 391; *Wheeler v. Roselawn Memory Gardens* (1989), 188 Ill. App. 3d 193, 204, 543 N.E.2d 1328, 1335.) The aggravation of a preexisting ailment or condition is a separate element of compensable damages. (*Grimming v. Alton & Southern Ry. Co.* (1990), 204 Ill. App. 3d 961, 983, 562 N.E.2d 1086, 1089-1100; *Behles v. Chicago Transit Authority* (1952), 346 Ill. App. 220, 231, 104 N.E.2d 635, 640.) We do not agree with the trial court that IPI Civil 3d No. 30.03 permits a double recovery. Instead, we believe that the combination of IPI Civil 3d No. 30.03 and IPI Civil 3d No. 30.21 correctly states the law in Illinois that a tortfeasor is liable for injuries he causes, including aggravation of a preexisting condition. (*Chicago City Ry. Co. v. Saxby* (1904), 213 Ill. 274, 72 N.E. 755.) To give IPI Civil 3d No. 30.21 without IPI Civil 3d No. 30.03 is, in our estimation, confusing; IPI Civil 3d No. 30.03 should also have been given.

■■ Defendant further contends that because the instructions complained of concern damages, even assuming we find them to be incorrect, they do not constitute reversible error because they did not affect the jury's determination of liability. What defendant fails to consider is that a general verdict form was used in the instant case. The verdict simply read:

"We, the Jury, find for the defendant, ALTON & SOUTHERN RAILWAY COMPANY, and against the plaintiff, ROGER FICKEN."

We have no way of determining whether the instructions complained of affected the jury's determination as to liability or merely damages.

### III

The second contention raised by plaintiff is that the trial court erred in refusing to allow plaintiff's treating physician, Dr. Ali, to testify as to his examination of plaintiff at the courthouse on the morning of trial. Plaintiff also contends that the trial court erred in limiting Dr. Ali's testimony to his own examination of plaintiff in July 1989, rather than allowing Dr. Ali to rely on the notes and records of his partner, Dr. Naseer. Dr. Naseer saw plaintiff on August 14, 1990. Dr. Ali testified that he and Dr. Naseer see each other's patients "interchangeably" and "rely on each other's notes and records." Defendant replies that plaintiff suffered no prejudice from the exclusion of

Dr. Ali's testimony because plaintiff was allowed to elicit opinions from Dr. Ali through a hypothetical question. Defendant further contends that any error was waived because plaintiff failed to make an offer of proof as to what Dr. Ali would have testified to concerning the corridor examination. Likewise, the trial court never ruled on defendant's objection to the possible questioning of Dr. Ali based upon Dr. Naseer's August 1990 examination of plaintiff. Before the trial court ruled on this matter, plaintiff's counsel interjected, stating he would ask the doctor his opinion by way of hypothetical. We believe that the trial court was unduly restrictive and such restriction constituted error.

■ The law is clear that a treating physician may give opinion testimony regarding the permanent nature of a patient's injuries, providing a recent examination has been performed. (*Wilson v. Chicago Transit Authority* (1988), 126 Ill. 2d 171, 533 N.E.2d 894; *Henricks v. Nyberg, Inc.* (1976), 41 Ill. App. 3d 25, 353 N.E.2d 273.) In *Wilson*, our supreme court allowed testimony by a treating physician concerning the permanency of plaintiff's injuries based on an examination conducted on the last day of trial without disclosure to the defendant. The defendant argued that the physician was an expert within the meaning of Supreme Court Rule 220, but the *Wilson* court found that not to be the case. (See also *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 529 N.E.2d 525.) *Wilson* also considered whether such an examination was contrived by the plaintiff in order to withhold information from the defendant. The *Wilson* court stated that the record did not "unambiguously support" the assertion that the plaintiff had engaged in a conceived plan of nondisclosure. (*Wilson*, 126 Ill. 2d at 176, 533 N.E.2d at 897.) *Wilson* then went on to hold that "[t]his type of surprise *** must be avoided by adequate trial preparation and not through reliance on the 'protection' of Supreme Court Rule 220." (*Wilson*, 126 Ill. 2d at 176, 533 N.E.2d at 897.) Two justices dissented, noting that no amount of trial preparation would have prevented the surprise resulting from the treating physician's examination the morning of trial. The dissenting opinions concluded that allowing this practice gives the plaintiff an undue advantage and is "not playing by the rules." *Wilson*, 126 Ill. 2d at 177-78, 533 N.E.2d at 897 (Ryan, J., dissenting); *Wilson*, 126 Ill. 2d at 178, 533 N.E.2d at 898 (Miller, J., dissenting).

In the instant case, the trial court took the following view:

"THE COURT: I am familiar with the cases that allow this. I want to take a quick look at them again. However, I can say that I don't agree with them. I really feel, particularly in this

instance where you have a doctor [who] has not seen him since August of 1990, so that's September, October, November, December, January, February, that's six months ago, in effect the Court would feel that he's no longer a treating physician at this point since he is not seen in six months, has no appointment to see him in the future, to wait in the last minute and have him examined in the corridors, I don't like. I don't care really what the cases say. I don't like it and I think that it's improper at this juncture. It's nothing more than in my opinion a [Rule] 220 examination by a doctor who was his treating physician at one point but is no longer that, and I want to take a look at the cases, but I don't like it, I don't think it's fair, I don't think it gives the defendant a fair opportunity to defend the case.

[Defendant's attorney]: I'd like to say one other thing. In case we have not elected to request an independent medical examination pursuant to Supreme Court Rule 215, we have known what the medical is. I have no idea what this doctor is going to say on the basis of this examination that's performed today in the middle of trial. I think it's greatly unfair to me because I can't come in—and if this doctor says something that I would like to refute I could have an exam, I'm obviously prevented from having such an exam at this point.

THE COURT: Let me think about it a minute, but my preliminary ruling is the objection is going to be sustained. I don't think it's fair for those reasons. They have prepared for trial based on the last examination by Schoedinger, which was in November, they—

[Plaintiff's attorney]: John.

THE COURT: John whatever, they elected not to have a [Rule] 215 examination, and then we get an exam, in the corridor in the middle of trial, if he now says there is some future problem which is going to cause future surgery or whatever, they are handicapped now.

[Plaintiff's attorney]: He's not going to say that.

THE COURT: It doesn't make any difference what he's going to say for whatever it is. How can they have an equal opportunity? Now, do you want to delay the trial for two weeks while they get an independent exam at this time?

[Plaintiff's attorney]: No, I don't.

THE COURT: I just don't—

[Plaintiff's attorney]: But when I had him look at the man this morning I relied on those cases.

THE COURT: That's fine, and we haven't hurt the trial so far, but I don't agree with the cases, I guess.

[Plaintiff's attorney]: I understand that.

THE COURT: I don't think it's proper. I don't think it's proper. I think that it's sandbagging in the worst order, which is all of what [Rules] 215 and 220 is [*sic*] supposed to get away from. We will see if we can find the cases, and let me take a look at them.

(Recess)

THE COURT: I've had a few moments now to reflect on what I said before and I'm going to stay with my ruling. I will not allow him to testify as to a corridor examination. I think it is absolutely outrageous. I don't know how anybody could ever prepare for trial if this is allowed. I think the recent Supreme Court case indicates that it is discretionary with the judge, and I also think that in that case there were several extenuating circumstances, although I don't even think they mitigate that much. After the examination apparently the plaintiff disclosed the examination to the defendant to interview the doctor before he hit the stand.

Secondly, in that case the defendant did not ask for a continuance to get another examination, which I understand from the tenor of what the defendant said in this case is not the case, that if he is put in that position that he would feel that he should have an opportunity to have an independent exam.

I think also the Supreme Court said that it is discretionary with the trial judge, in the exercise of my discretion, and I feel that it is totally unfair to the defendant. I will sustain the objection, and he will not be allowed to testify as to the corridor examination."

The majority in *Wilson* agreed that a treating physician can testify concerning the permanency of plaintiff's injuries based upon an examination performed the day of trial. Moreover, the dissents in *Wilson* make it clear that the court was aware of the problems presented by such testimony. Other courts have also considered such problems. Whether such testimony allows a plaintiff to go forward under a "conceived plan of nondisclosure" has been considered by our colleagues on the First District Appellate Court in the recent opinion of *Phelps v. Chicago Transit Authority* (1991), 224 Ill. App. 3d 229, 586 N.E.2d 352. The *Phelps* court specifically stated:

"The *Wilson* decision demonstrates, however, that the supreme court is well aware of the problems caused by such undisclosed

last-minute examinations. Despite this awareness, the court has not acted to amend its discovery rules to address the situation. Perhaps this is an area which should be covered by supreme court rules or appropriate legislation. However, given the complete lack of authority supporting the CTA's position, we decline to reverse the trial court's decision to admit the testimony in question." (*Phelps*, 224 Ill. App. 3d at 233, 586 N.E.2d at 355.)

We agree with the *Phelps* court that the supreme court was well aware of the problems caused by undisclosed last-minute examinations, but the court determined that testimony based upon such examinations was nevertheless admissible. In the instant case, we believe the trial court erred in not allowing Dr. Ali to testify based upon his examination of plaintiff earlier in the day.

Moreover, the record discloses that the error was further compounded by the trial court's refusal to allow Dr. Ali to testify based upon his examination of the record and notes of his partner, Dr. Naseer, from an August 1990 examination of plaintiff. Defendant is incorrect that plaintiff acquiesced in defendant's objection to Dr. Ali relying on Dr. Naseer's notes. The following excerpt from the record clearly indicates that the trial court was not going to allow Dr. Ali to rely on Dr. Naseer's notes and that Dr. Ali's testimony would be limited to his own examination of plaintiff in July 1989.

"[Defendant's attorney]: Now, Your Honor one thing. I anticipate, and I'm not sure how we were going to handle this with the doctor, because one of the things that I want to ask the doctor is the last time he examined the plaintiff, and I want— because I think Dr. Naseer was the one that saw him in August of last year, I think Dr. Ali hasn't seen him since July of 1989, and I'm trying to—

THE COURT: Then I think the doctor ought to be brought back in here and instructed he can in no way rely upon that examination and must answer all questions as of the last time he saw him in July of 1989.

[Plaintiff's attorney]: Wait a second. As of August of '90 because Ali and his partner relies [*sic*] on each other's records, he can rely on the records. It's one thing to keep out my exam this morning, but it's another thing to throw away all the records he's relying on.

THE COURT: Do you really want me to answer that? Do you want to make an issue of that? I'll answer it.

[Plaintiff's attorney]: Are you saying he can't provide him the records?

THE COURT: Are you asking me now on the record to make a statement? I'll make the statement.

[Plaintiff's attorney]: I don't want to put on the record when you start talking about like that the hair starts to stand up.

THE COURT: It ought to, because there is a very simple answer to what you're saying. Do you want the answer?

[Plaintiff's attorney]: I don't know that I want it on the record.

THE COURT: It's the only way I'm going to give you an answer.

[Plaintiff's attorney]: I suppose I may as well hear it.

THE COURT: Do you want to hear it? The Court doesn't feel he can rely upon the records of August of 1990 since he didn't see him after that date. When did he rely upon him for the further treatment and care of the patient? He never relied on those records. He never saw him again. The reason they are admissible and not hearsay is because it's an exception which says that if a doctor later relies upon them in his further diagnosis and treatment of the patient the doctor accepts them as so accurate to use them as a basis for care and treatment, that if he's willing to rely upon them why aren't we, but if the last time this doctor saw him was July of 1989, he was just seen by another doctor in August of 1990, this doctor never saw him after August of 1990, how can he have relied upon these records? He didn't rely on them. He never saw them, did he, he didn't see—he never saw them in any physician/patient contact nor did he use them.

[Plaintiff's attorney]: I think you're being unduly restrictive. I really do.

THE COURT: That's what makes horse races. I don't because I don't think he relied on them in August of 1990. How did he rely on them? When can he rely on them?

[Plaintiff's attorney]: He's the man's treating physician. He and his partner see each other's patients interchangeably. They see patients for each other and couple each other's records. I mean, I think that this is, I think it's wrong.

THE COURT: It's in the record right now because there has been no objection to it at this point, and I'm not going to

go back and wipe it out. I don't know how in the hell we could go back and do that. Pardon my French, for the record, I can't.

[Defendant's attorney]: I interpose an objection, if I didn't make it clear to the Court, and that's why I asked the question—or objected when he asked the question.

THE COURT: You asked a question based on speculation and time frame and he laid that foundation and continued on without objection.

[Plaintiff's attorney]: I will tell the doctor and I will do it by hypothetical.

THE COURT: As far as—

[Plaintiff's attorney]: I'm going to ask him to assume the back surgery and assume Mr. Ficken telephoned yesterday that he still has pain.

THE COURT: There is nothing wrong with that. You can have a hypothetical based on the evidence."

The above colloquy clearly demonstrates that there was no acquiescence by plaintiff in the trial court's ruling nor was there any waiver of this issue by plaintiff. Moreover, we cannot agree with defendant that there was no prejudice to plaintiff because Dr. Ali was able to testify in the hypothetical. Instead, we agree with plaintiff that Dr. Ali's credibility was hurt and his testimony not as effective because of the trial court's erroneous ruling which forced plaintiff's attorney to ask questions about the permanency of plaintiff's injury in the hypothetical. Accordingly, we find that the trial court erred in unduly restricting Dr. Ali's testimony.

## IV

■ The final argument we will consider is whether the trial court erred in refusing to allow the proper impeachment of Floyd Cooper, superintendent of the railroad. In this regard, we believe two of plaintiff's contentions are meritorious. First, plaintiff contends that the trial court erred in refusing to allow introduction of David Bruner's personal injury report. The Bruner report was prepared by an employee of the railroad on the date of the accident and was a summary of those events. The Bruner report indicated that the train on which plaintiff was riding at the time of his injury was moving at six miles per hour at the time of impact. This was in conflict with other testimony presented that trimming should be done at four miles per hour or less. Plaintiff claims the Bruner report was admissible under the business records exception to the hearsay rule. Defendant replies that the trial court was correct to exclude the Bruner report because its

author had since died, because it lacked probative value, and because its integrity was suspect. We believe the Bruner report contained information relevant to plaintiff's case and should have been allowed into evidence.

We recently considered a similar issue in *Amos v. Norfolk & Western Ry. Co.* (1989), 191 Ill. App. 3d 637, 548 N.E.2d 96. In *Amos*, another FELA case, the issue was whether the trial court erred in admitting into evidence under the business record's exception to the hearsay rule summaries of recorded statements of three railroad employees taken by a railroad claim agent approximately one month after the accident there in question. The summaries there related to events on the day of the plaintiff's injury and were not favorable to the railroad. In determining such summaries were admissible under Supreme Court Rule 236, the business records exception to the hearsay rule (134 Ill. 2d R. 236), we relied on *Poltrock v. Chicago & North Western Transportation Co.* (1986), 151 Ill. App. 3d 250, 502 N.E.2d 1200, which held that accident reports sought to be admitted *against* the party who prepares them are admissible because in such instances there is no reason to question their trustworthiness. (*Amos*, 191 Ill. App. 3d at 646, 548 N.E.2d at 101.) In addressing concerns about the integrity of the report, we stated in *Amos*:

> "That the summaries may contain the conclusions or opinions of the preparer do not disqualify them under the business records exception to the hearsay rule. Instead, that fact affects only the weight of the evidence, not its admissibility. (*Birch v. Township of Drummer* (1985), 139 Ill. App. 3d 397, 407, 487 N.E.2d 798, 806.) Nor do we find anything in Supreme Court Rule 236, which sets forth the business records exception to the hearsay rule, which disqualifies what the defendant refers to as double hearsay. (107 Ill. 2d R. 236.) Rule 236 expressly states that lack of personal knowledge by the maker of the record may affect its weight, but not its admissibility. Both the oral statements and the summaries were made by employees of defendant in the regular course of defendant's business." (*Amos*, 191 Ill. App. 3d at 646, 548 N.E.2d at 102.)

In the instant case, defendant stipulated to the foundation of the report before the trial court ruled on its admissibility. Even though the author of the report was deceased at the time of trial, we believe its integrity was sound. The report was prepared by an employee of the railroad on the same day of the accident and contains information against the railroad's interest. We believe the Bruner report was relevant to plaintiff's theory of the case and should have been admitted

into evidence. This is especially true since the defense made at least two references, once during the examination of Floyd Cooper and once during his closing argument, to the fact that the evidence in this case showed the train was only moving at two miles per hour. The railroad's guidelines in this respect are that trimming should be done at no more than four miles per hour. We believe the exclusion of the Bruner report was erroneous and prejudicial to plaintiff.

■ The second contention raised by plaintiff is that the "Heath" document was relevant, inconsistent with defendant's position at trial, and should have been admitted. The Heath document was a series of letters between a union official and R.E. Heath, then superintendent of the railroad, which explained elimination of the bull ring man. It was plaintiff's contention that the bull ring position was eliminated in retaliation for a safety complaint concerning another matter. Plaintiff allegedly sought to introduce the Heath document for the purpose of impeaching the testimony of Floyd Cooper as to the reason defendant eliminated the bull ring man. Defendant replies that Cooper was never questioned about why the bull ring position was eliminated, so plaintiff could not have been prejudiced by the trial court's refusal to admit the Heath document for that purpose. Moreover, defendant insists that the Heath document addresses safety with respect to cars running out of the west end of the yard, which has nothing to do with the alleged problems in this case; therefore, the Heath report is irrelevant. Defendant's position is that the bull ring man's purpose was not to tell the crew where gaps were on the east end or middle of the track but to adjust retarders at the end of the bowl to keep the cars from running out. We, however, agree with plaintiff that the Heath document was relevant and should have been admitted.

In June 1980, a union representative wrote to the then-superintendent of the railroad, R.E. Smith, complaining that the retarders on the west end of the bull yard needed adjustment. Heath's response to the letter was as follows:

> "These retarders are adjusted for movement of cars out of the bowl, and this is the reason for having bull ring men on the west end. If you insist on making adjustment on retarders so that the bull ring man can stay in shanty all the time then it will be done and I can see no reason for having bull ring men on the west end which I can resolve at your request."

Plaintiff and five other employees of the railroad testified that the trimming maneuver was safer when the bull ring man was present. All these witnesses were leery about shoving cars in the blind. Plaintiff's theory of the case was that the accident would not have occurred had the bull

ring position been maintained by defendant. Nevertheless, defendant argued that the bull ring man was totally irrelevant to this lawsuit, and the trial court agreed. We have reviewed Floyd Cooper's testimony and believe that plaintiff's attempts to impeach Cooper with this document were appropriate. As plaintiff asserts, the overall theme of Cooper's testimony was that the trimming maneuver was safe. The Heath document advances plaintiff's theory that the trimming procedure was not safe because the bull ring man was removed and defendant's employees were expected to shove in the blind. The Heath document gives an explanation of why the bull ring position was eliminated, and, as plaintiff could argue from the tenor of the letter, safety was not a consideration in elimination of that position.

For evidence to be relevant, it must tend to prove a matter in controversy. (*Bullard v. Barnes* (1984), 102 Ill. 2d 505, 519, 468 N.E.2d 1228, 1235.) Plaintiff's complaint specifically alleged that defendant "was negligent in that it: (a) Failed to provide the Plaintiff with a reasonably safe place to work." That trimming was safer when a bull ring man was present was one of plaintiff's theories of this case. Since the elimination of the bull ring position and the reason given were matters in controversy, the Heath document was relevant and should have been admitted.

Plaintiff has raised numerous other allegations of error. However, in light of our finding error in the foregoing matters, we need not address these allegations, nor do we need to address the issue of whether the verdict finding against plaintiff was against the manifest weight of the evidence. The cumulation of the errors we have discussed made it impossible for the jury to return a verdict free from prejudice. We therefore find that plaintiff is entitled to a new trial.

In light of our determination that a new trial is required, we will deal with another allegation of error, one that might otherwise recur. Specifically, it was error for the trial court to prohibit plaintiff's counsel from reading a previously approved definition instruction to the jury during closing argument.

Prior to final arguments the court and counsel conducted an instruction conference at which all instructions to be given to the jury were determined. Immediately before argument, the court advised the jury as follows:

> "Also at this time [the lawyers] are fully aware of what the jury instructions in the case will be and they are allowed to refer to the instructions of law. They are allowed to tell you what they think the instructions will be. Again, should they in any way misstate these instructions you should disregard that."

During plaintiff's argument, the following took place:

"[Plaintiff's attorney]: [W]hen you come down to a case like this it's necessary for the plaintiff to show some negligence on the part of the defendant, something the railroad did wrong, but it's a very different standard, [than] the standard that most of us would think, because here is what your honor is going to read to you in this case. He's going to tell you 'When I use the expression—'

THE COURT: Well, let the Court stop you. You should not read from the Court's instructions. You may tell the jury what you think I will read, but please put the instruction down on the table and do not read it to the jury."

■ Trial counsel are allowed to refer to instructions the court will give to the jury and, when not too lengthy or misleading, to read instructions or portions of them as part of closing argument. As noted in *Sidorewicz v. Kostelny* (1981), 102 Ill. App. 3d 851, 430 N.E.2d 377, counsel may state their belief as to the content of anticipated instructions in developing their closing argument, with the caveat that such remarks not be misleading. In *Soderquist v. St. Charles Mall Associates, Ltd.* (1988), 177 Ill. App. 3d 207, 532 N.E.2d 903, counsel used a poster board blowup of an instruction during closing argument. While our court considered this unduly emphasized the instruction, it found no prejudice and specifically did not differ with the trial court's comment that counsel could read portions of the same instruction to the jury if not too lengthy.

In the case at bar, plaintiff's counsel was attempting to read a very short definitional instruction previously approved by the court, to aid the jury in understanding his argument. This proposed action would clearly be in line with the authority cited above. Since verbatim, it would not be a misstatement, it would be short, and from the apparent context it would not be misleading or an undue emphasis. It seemed intended to foster jury understanding of his argument, a clearly permissible goal. In this context, the trial court's refusal to allow plaintiff's counsel to read the instruction was error.

For the foregoing reasons, the judgment of the circuit court of Madison County is hereby reversed, and the cause is remanded for a new trial.

Reversed and remanded.

RARICK and WELCH, JJ., concur.