**TRANSCRAFT, INCORPORATED and Cunningham Enterprises, Incorporated, Plaintiffs–Appellees,**

v.

**GALVIN, STALMACK, KIRSCHNER & CLARK, Francis J. Galvin, Jr., and Eric L. Kirschner, Defendants–Appellants.**

Nos. 93–3684, 94–2717.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1994.

Decided Nov. 14, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 28, 1994.

William A. Alexander, Troutt, Alexander, Popit & Warner, Benton, IL, Rodney V. Taylor (argued), Christopher & Taylor, Indianapolis, IN, Frederic C. Sipe, Sipe, Pankow, Han & Free, William L. Schlosser, Indianapolis, IN, Thomas G. Brackman, St. Louis, MO, for plaintiffs-appellees.

Nancy G. Lischer (argued), D. Kendall Griffith, Hinshaw & Culbertson, Chicago, IL, Mark D. Bauman, Brian D. Malkmus, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Belleville, IL, for defendants-appellants.

Before POSNER, Chief Judge, EASTERBROOK, Circuit Judge, and GORDON, District Judge.*

POSNER, Chief Judge.

The appeals in this diversity suit for legal malpractice raise a variety of issues, mainly but not only of causation and of computation of damages. The principal plaintiff, Transcraft Corporation, is a manufacturer of flatbed truck trailers. In 1985 a man named Weekley was driving a semitractor hauling a loaded Transcraft trailer. His wife was in the cab. While Weekley was attempting to exit from an interstate highway, the rig left

---

* Hon. Myron L. Gordon of the Eastern District of Wisconsin.

the road and turned over. Weekley's head was injured in the accident. His wife broke a couple of vertebrae in her neck, but apparently her husband's injury was the more serious, unless its gravity has been exaggerated—of which more later. The Weekleys sued Transcraft, claiming that the accident had been due to grossly negligent welding of a key part of the trailer.

Liberty Mutual, Transcraft's products-liability insurer, assumed the defense of the suit and hired Galvin, Stalmack, Kirschner & Clark, an Indiana law firm, to handle it. A jury awarded the Weekleys $3.5 million in compensatory damages and $1.25 million in punitive damages. Liberty then settled the case before appeal by paying the Weekleys the $3.5 million in compensatory damages that the jury had awarded them; the Weekleys waived punitive damages in exchange for Liberty's not appealing.

Transcraft paid nothing. But the following year Liberty refused to renew Transcraft's insurance, precipitating this suit by Transcraft against Liberty, the Galvin firm, and the partners (now former partners, the firm having dissolved) who had handled the Weekleys' suit. The claim is that the law firm—and Liberty, by failing to supervise the firm and in other ways—botched the defense of the suit and that as a result of having a $3.5 million loss on its record Transcraft is unable to buy liability insurance on reasonable terms and has therefore been forced to "go bare," jeopardizing its survival and reducing its market value. The jury agreed and awarded Transcraft $1.5 million in damages (all compensatory) for the diminution in Transcraft's value, which it apportioned $1 million to the law firm and $500,000 to the insurance company. It should not have apportioned liability for compensatory damages, as we shall see. Liberty has settled with Transcraft and is not a party to the appeals.

The defendants (collectively "Galvin") argue that no rational jury could have found negligence in the defense of the Weekleys' suit. We agree that the evidence of negligence was meager and equivocal, that a number of the alleged acts of negligence were either nothing of the kind or unrelated to the outcome of the lawsuit, and that the logic and credentials of the plaintiff's expert witness on standards of professional competence in litigation were unimpressive. But we do not think that Transcraft's case was so weak that the jury can be said to have acted irrationally in finding that there was negligence which affected the outcome of the Weekleys' suit.

 The plaintiff in a case of malpractice, legal as well as medical, must prove that the defendant failed to come up to minimum standards of professional competence, or to higher standards if he represented himself to be a specialist or to have unusual qualities. *Hays v. Sony Corp. of America,* 847 F.2d 412, 419 (7th Cir.1988); 1 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 15.4 (1989). The malpractice claimant must also prove that as a result of the lawyer's incompetence he, the client, lost his case, or paid a larger judgment than would have been awarded had the defendant performed competently, or suffered some other harm. *Picadilly, Inc. v. Raikos,* 582 N.E.2d 338, 344 (Ind.1991); *Cornett v. Johnson,* 571 N.E.2d 572, 575 (Ind.App.1991); *Winskunas v. Birnbaum,* 23 F.3d 1264 (7th Cir.1994); *Mitchell v. Transamerica Ins. Co.,* 551 S.W.2d 586 (Ky.App.1977). The evidence of negligence in this case consists of a litany of alleged mistakes made by Galvin in the handling of the Weekleys' lawsuit. First, it is argued, Galvin should have moved for a change of venue, from Indiana to Illinois. The accident had occurred in Ohio. The Weekleys live in Indiana and brought their suit there. Transcraft is an Illinois corporation, and communication between it and Galvin would have been easier had the lawsuit been conducted in a court nearer its headquarters. This is a trivial theory of legal malpractice, and should not have been allowed to go to the jury. Venue was proper in the Northern District of Indiana, where the Weekleys reside and Transcraft has its largest dealership. A motion to transfer the case to Illinois would almost certainly have failed, since Illinois could not be considered on balance more convenient for the parties, the lawyers, and the witnesses; and the legal standard for the grant or denial of a motion for a change of venue is the balance of conve-

niences. *Coté v. Wadel*, 796 F.2d 981, 984–85 (7th Cir.1986). It is not malpractice to fail to make a motion that has little chance of being granted and if granted would confer a merely speculative benefit on the movant. So courts long have held with reference to motions for change of venue. *Nave v. Baird*, 12 Ind. 318, 319 (1859); *Woodruff v. Tomlin*, 616 F.2d 924, 931 (6th Cir.1980); 1 Mallen & Smith, *supra*, § 15.5, p. 874 n. 13. Judges ought not by taking an expansive view of the tort of legal malpractice create incentives for lawyers to engage in busy "motion practice" in order to insulate themselves from legal liability. Judges ought not, in other words, encourage the practice of "defensive law" in the bad sense in which the term "defensive medicine" is used of physicians who feel impelled by threat of malpractice liability to order tests that cost more than their expected benefits.

■ Another dubious allegation of professional misconduct is that Galvin had a conflict of interest because of the firm's prior representation of the Weekleys. It was in an unrelated matter but in the course of it Galvin had learned about the unsound condition of Mrs. Weekley's neck prior to the accident. How this alleged conflict of interest could have hurt Transcraft is difficult to fathom. Only the Weekleys could have been hurt. Or so it seems. But Transcraft argues that since the knowledge of Mrs. Weekley's preexisting condition had been obtained in the course of legal representation, Galvin was inhibited in cross-examining Mrs. Weekley about the extent of the injuries that she suffered in the trailer accident. Even if this is true, its relevance to the litigation is unclear. For suppose that the accident broke Mrs. Weekley's neck only because the neck was abnormally weak; this would not make a straw of difference to damages (let alone liability); the "eggshell skull" rule makes the tortfeasor take his victim as he finds him. *Ficken v. Alton & Southern Ry.*, 255 Ill. App.3d 1047, 193 Ill.Dec. 51, 625 N.E.2d 1172, 1178 (1993); *Pace v. Ohio Dept. of Transportation*, 62 Ohio Misc.2d 184, 594 N.E.2d 187, 188 (Ohio Ct.Cl.1991); *Niehus v. Liberio*, 973 F.2d 526, 528 (7th Cir.1992); cf. *Defries v. State*, 264 Ind. 233, 342 N.E.2d 622, 630 (1976). We say this with confidence although we have not been able to discover what state's substantive law was believed to furnish the rule of decision in the Weekleys' lawsuit. Recall that while the accident occurred in Ohio, the plaintiffs were domiciled in Indiana and the defendant is an Illinois corporation. Probably Ohio law applied, *Rice v. Nova Biomedical Corp.*, 38 F.3d 909 (7th Cir.1994), but it hardly matters, because the parties have not made an issue of it and because the eggshell-skull rule is in force in all three states having some connection to the suit, as are the other legal doctrines applicable to the Weekleys' suit.

■ Still another questionable charge is that Galvin impaired the defense of the Weekleys' suit by failing to give timely notice to Transcraft of the plaintiffs' reinstatement of their claim for punitive damages. Since Liberty's policy did not protect Transcraft against the consequences of willful misconduct, of which an award of punitive damages would be one, Galvin, whose primary loyalty was to Liberty, was required to notify Transcraft of any claim for punitive damages so that Transcraft could hire a lawyer to protect its uninsured interest. But since Liberty in the end paid the whole judgment, Transcraft was actually benefited by not being notified of its exposure to punitive damages—it saved the expense of hiring its own lawyer.

Unless that lawyer would have taken steps that would have avoided the award of punitive damages. Although the Weekleys dropped their claim of punitive damages in exchange for Liberty's not appealing from the award of compensatory damages, had the jury not awarded punitive damages the Weekleys would have lacked this bargaining chip and would undoubtedly have accepted a reduction in the award of compensatory damages in order to avoid jeopardizing the award if Liberty appealed. And then the loss on Transcraft's record would have been smaller.

Whether a different lawyer could have prevented the award of punitive damages merges with the question whether Galvin failed to make adequate efforts to rebut the plaintiffs' evidence that Transcraft's welders were so greatly at fault as to justify an award of

punitive damages against their employer. The Transcraft trailer that injured the Weekleys was connected to the semitractor by what is called a "fifth wheel plate," and the Weekleys contended that the accident had been caused by the plate's breaking because it had been improperly welded. There was evidence that Transcraft's welders, to save time, would weld over bad welds rather than, as they should have done, use a grinder or air arc to remove the weld and then redo it, and that this carelessness was condoned by the welders' supervisors. Galvin failed to retain an independent metallurgist to evaluate Transcraft's welding practices, failed to call witnesses from within Transcraft who could have testified to the care with which the welding was inspected by the company's welding inspectors, failed to cross-examine the welders who testified for the Weekleys about their lack of care, and also failed to present evidence, which Transcraft argues could have been obtained, to prove that the accident could not have been a consequence of the failure of the fifth wheel plate but must have been due to Mr. Weekley's taking the exit ramp at too high a speed. Most of these so-called failures are spurious. The case for Transcraft was hopeless. Galvin was advised by an engineer whom Transcraft itself had advised him to consult on the matter that no reputable metallurgist would give testimony helpful to Transcraft's case. The theory that the accident had been caused by speeding was greatly undermined by expert evidence that Weekley had been driving at a speed of only 25 miles an hour on a stretch of road on which he could have driven safely at a speed of 61 miles per hour.

Maybe an unscrupulous lawyer could have thrown enough sand in the jury's eyes to avert a judgment for the Weekleys, or at least an award of punitive damages, but unwillingness to do so is not evidence of malpractice. Refusal to violate professional ethics—or even to approach as near to the line as humanly possible—is not professional misconduct. *Stricklan v. Koella,* 546 S.W.2d 810 (Tenn.App.1976). A scrupulous lawyer, a lawyer who takes Law Day rhetoric seriously, who sincerely believes that he has a dual duty, to his client and to the law, and acts on his belief, may lose some clients to his less scrupulous competitors but he should not be deemed to be courting a tort judgment.

Galvin's failure to cross-examine the welder witnesses may seem particularly questionable. But Transcraft in the malpractice suit failed to present any evidence concerning what they would have said on cross-examination in the trial of the Weekleys' suit that might have warded off the award of punitive damages.

■ That leaves only one significant allegation of possibly actionable malpractice: Galvin's failure (strangely mirrored in the present case, as we shall see) to make a serious effort to knock down Mr. Weekley's compensatory damages. The only medical witnesses to testify were witnesses for the plaintiffs. They testified that as a result of the accident Weekley had suffered a significant loss of brain tissue, had undergone a personality change, could no longer drive, no longer organize or plan anything, and was "disabled from competitive employment." This may well have been a considerable exaggeration. Galvin had in hand but did not introduce evidence that Weekley had faked seizures while in the hospital in order to induce a visit from his wife. Galvin did not, as it was entitled by the Federal Rules of Civil Procedure to do, retain an independent medical expert to examine Weekley. This was careless. The extent of a plaintiff's injuries, short of death, should never be taken for granted, as this is a particularly rich area for litigation fraud. Only a few months after the trial, Weekley applied for a West Virginia driver's license, certifying that he had no major impairments. He got the license. Video surveillance conducted by Transcraft in 1993, in connection with the present suit, reveals Mr. Weekley driving a car and going about his business in apparent normality. Of course 1993 is not 1989, the date of the Weekley trial. But adults do not grow new brain tissue.

Galvin argues that the videotape is not of Weekley at all. Maybe so; the tape is indistinct; but the jury was entitled to reject the imposture theory and conclude that had the Galvin firm been on its toes it would have gathered convincing evidence that Weekley

had not been so seriously injured as he had persuaded the jury that he was. Nor is it a compelling argument that for Galvin to have disparaged Weekley's injuries would have alienated the jury. That would depend, in part anyway, on the actual severity of those injuries, which Galvin failed to make any effort to ascertain. If Weekley was lying about his injuries, unmasking his lies would not make the jury love him all the more. So at least the jury in the malpractice case could reasonably have concluded; and presumably one jury is a pretty good judge of the probable reaction of another jury. A reasonable jury could have found that a competent trial lawyer in Galvin's situation would have explored Weekley's condition in greater depth and as a result of doing so would have obtained evidence that would have persuaded the jury to bring in a lower verdict. Therefore Galvin was not entitled to judgment notwithstanding the verdict on the issue of liability.

■ Galvin also argues for a new trial, claiming error in evidentiary rulings. Only one of the alleged errors is serious enough even to require discussion, but it was a very serious error which alone requires a retrial on liability. An alternative basis for a new trial, not clearly argued, hence possibly waived, but in any event unnecessary to consider, is that the jury's verdict may have been based on allegations of malpractice that should not have been submitted to the jury, such as Galvin's failure to move for a change of venue. *Wilmington Star Mining Co. v. Fulton*, 205 U.S. 60, 79, 27 S.Ct. 412, 419, 51 L.Ed. 708 (1907); *Virtual Maintenance, Inc. v. Prime Computer, Inc.*, 11 F.3d 660, 667 (6th Cir.1993).

The serious error was the district judge's refusal to admit into evidence the transcript of the *Weekley* trial. A trial transcript is hearsay (though sometimes admissible, under an exception to the hearsay rule, Fed.R.Evid. 804(b)(1)) if offered to prove the truth of testimony presented at the trial. But that was not the purpose for which Galvin wanted to put the transcript of the *Weekley* trial into evidence. Galvin wanted to show that the testimony of the plaintiffs' witnesses, whether truthful or not, was so extensive and so

damaging to Transcraft that it was most unlikely that anything Galvin could have done would have succeeded in defeating a judgment for the Weekleys or even in deflecting an award of punitive damages. Such use of the transcript of the underlying trial is not only routine in legal malpractice suits; it is also far superior to having the participants in the trial testify to their recollections; and its admissibility for this purpose, that is, for establishing the strength (or weakness) of the plaintiff's case, the case he claims the lawyer botched to his detriment, cannot be questioned. *Walker v. Bangs*, 92 Wash.2d 854, 601 P.2d 1279, 1283–84 (1979); 2 Mallen & Smith, *supra*, § 27.20; cf. *Picadilly, Inc. v. Raikos, supra*, 582 N.E.2d at 344; *Honeywell v. American Standards Testing Bureau, Inc.*, 851 F.2d 652, 656 (3d Cir.1988). The error cannot be deemed harmless in this case. The question of Galvin's negligence, and of its impact on the jury in the Weekleys' case, was a close one.

The issue is fogged up a bit by the fact that Galvin's lawyer attempted to place the transcript of the accident case in evidence only after the judge refused to allow him to call a lawyer and an expert witness to testify to what had gone on at the trial of that case. The judge refused on hearsay grounds to let the lawyer testify, though the lawyer was not attempting to testify to the truth of anything. The judge refused to let the expert testify because he had not been listed as a potential expert witness before trial. But he was not being asked to testify as an expert. He was being asked to testify to what he had testified in the previous trial. The testimony of both witnesses should have been admitted, or in lieu of their testimony a transcript (a more accurate record than their recollections, and hence a superior alternative, as we have said) of the pertinent portions of the previous trial.

■ So there must be a new trial on liability—and on damages as well? Galvin argues that the $1.5 million that the jury awarded for the reduction in Transcraft's market value is not supported by the evidence. This is certainly true. In fact the theory of damages that Transcraft was allowed through its economic witness to present to the jury was a fantastic one, revealing on the part of the

witness (George Launey) not only a lack of familiarity with the relevant principles of corporate valuation (concerning which there is an extensive scholarly literature illustrated by Clifford W. Smith, Jr., *The Modern Theory of Corporate Finance* (2d ed. 1990), and Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* (4th ed. 1991)) but also a lack of common sense. The theory was that the $3.5 million loss although fully insured had prevented Transcraft from obtaining products liability insurance and therefore destroyed its value as a going concern. The jury was asked to award Transcraft the difference between that value and its value on the auction block.

Now to begin with, the counterfactual world that provides the benchmark for assessing damages (*Nicolet Instrument Corp. v. Lindquist & Vennum*, 34 F.3d 453, 456–57 (7th Cir.1994)) is not one in which Transcraft would have sustained no loss on its record as a consequence of the accident to the Weekleys. It is wholly improbable, on the evidence presented in both the Weekleys' case and the malpractice case, that any lawyer could have obtained a judgment in Transcraft's favor. At most, Galvin's professional negligence resulted in a higher judgment for the Weekleys than would otherwise have been rendered. The issue of damages in this case is what effect that *increment* of tort damages had on Transcraft's value.

Even if this essential point is disregarded, it is false that Transcraft could not have obtained products liability insurance in the wake of the *Weekley* judgment and ensuing settlement. The evidence is *unquestioned* that it could have obtained such insurance, only at a higher price and with a larger deductible. The higher price would be an allowable item of damages, assuming that its causal relation to the damages increment in *Weekley* plausibly attributable to Galvin's negligence were shown, which was not done. And the larger deductible too. It would have imposed an expected (that is, a probabilistic rather than certain) cost on Transcraft measured by the amount of the increase in the deductible times the probability that Transcraft would be required to pay a claim of that amount, all discounted to present value.

Suppose that the deductible would have been increased from $100,000 to $200,000 and that there is a 10 percent probability that over some interval of time Transcraft would have had to pay a $200,000 claim. Then the expected cost of the increase in the deductible due to Galvin's negligence would be $10,000 ($200,000 − $100,000 = $100,000 × .10 = $10,000), and it would be discounted to present value using an appropriate interest rate and some assumption concerning when the claim was likely to be made and paid.

No such effort at a realistic calculation of damages was attempted, perhaps because when Liberty cancelled its insurance Transcraft decided not to buy a new insurance policy at the higher rate and with the diminished coverage owing to the larger deductible, but instead to self-insure. Assuming that this was a reasonable business decision precipitated by Galvin's negligence in failing to minimize the loss resulting from the Weekley accident and causing (if, as a result of that failure, the *incremental* damages in the *Weekley* case for which alone Galvin may have been responsible did cause) Liberty to refuse to renew Transcraft's policy on its previous terms, the issue becomes the consequences of the decision to self-insure. At a first cut, the consequences are simply that Transcraft saved itself the expense of paying insurance premiums. Economists are puzzled why corporations ever buy liability insurance, since limited liability protects the shareholders (at least those who hold reasonably diversified portfolios) from the consequences of a disaster that might overtake the corporation as a result of a tort judgment. *Eljer Mfg., Inc. v. Liberty Mutual Ins. Co.*, 972 F.2d 805, 809 (7th Cir.1992). But they do, so self-insurance must often impose costs, and possibly it did in this case (Transcraft is a family corporation and maybe the family's entire wealth is sunk in it); but of that there is no evidence at all.

The evidence that Transcraft's value as a going concern has been destroyed, so that if the family that owns it decided to sell it all they could get was scrap value, consisted solely of the expert's say-so, and was unworthy of belief. Many corporations self-insure. Any such corporation that bought Transcraft

would not refuse to pay going-concern value simply because Transcraft was uninsured, since if Transcraft *were* insured this hypothetical purchaser would upon purchasing it cancel the insurance. A purchaser that was not a self-insurer might not pay as much for Transcraft as it would if Transcraft had insurance, but it does not follow that it would pay only scrap value. It would evaluate the risk of liability and the cost of extending its insurance policy on its existing operations to cover it. The cost might be slight. Scrap value is actually a peculiarly inapt benchmark in this instance, since it is what the judgment creditor in the hypothetical case in which Transcraft is hit by a huge tort judgment for which it has no insurance would levy on, leaving the owners of Transcraft with nothing—or at least not with the scrap value of its physical assets.

Even if Transcraft were rendered unsalable at any price by Galvin's negligence (for want of a nail the kingdom was lost), it would not follow that it had been harmed to the extent of its value as a going concern. There was no evidence that the family which owns Transcraft plans to sell it. Even so, impairment of the marketability of an asset reduces its value, since sale value is a dimension of value even when hypothetical. A person who owns a house that he does not intend to sell would still be distressed to be told that he can never sell it for more than its value in demolition. The right of sale, a valuable option even if never exercised, is particularly valuable to family-owned corporations, many of which are sold when the founder dies or retires. But the loss of a purely hypothetical sale value of Transcraft would be another of those probabilistic losses—like the possible tort claim that would be more costly because Transcraft would have had a larger insurance deductible had it not decided to self-insure— that has to be discounted by its probability in order to establish a reasonable estimate of the actual cost. The cost of a 10 percent chance of losing $1 million is not $1 million. The jury should have been asked, at a minimum, to estimate by how much the sale value of Transcraft was diminished by its lack of insurance and how likely it is that the owners would have sold the company at some time over some reasonable interval, say at some time within ten years following the decision to self-insure. This was not done. At the time of trial, three of the ten years had passed, with no indication of an imminent sale.

What remains is some possibility that Galvin's negligence caused Transcraft to have a worse loss record by some as yet undetermined amount, and that this worse loss record in turn reasonably induced Transcraft to self-insure, and that this decision, although as yet it appears only to have saved Transcraft money (for there is no evidence that between the decision to go bare in 1990 and the trial in 1993 Transcraft paid out in claims more than it saved in insurance premiums), will in the long run hurt Transcraft more than it helps it, by reducing the sale value of the company or the risk-adjusted value of the owners' wealth. The chain of speculation that connects Galvin's negligence to a monetizable loss to Transcraft is a long and fragile one—and may be longer and more fragile by the time the case is retried. But we are not prepared to say that no reasonable jury could find that the chain held and assign a rational if inherently somewhat speculative value to the loss caused by it. This jury, however, was not given the materials for a responsible evaluation.

The criticisms that we have made of Transcraft's evidence of damages go beyond anything found in the defendants' brief, and if given a chance Transcraft might be able to rebut them persuasively. But the defendants said enough in their brief, to which Transcraft had a full opportunity to respond, to persuade us that the damages were calculated improperly. We have gone further in our analysis of damages in an effort to assist the parties and the district judge on remand in taking steps to assure the rational calculation of damages, a phase of litigation about which we have repeatedly expressed concern, most recently in *Nicolet Instrument Corp. v. Lindquist & Vennum, supra*, 34 F.3d at 457. At the retrial, Transcraft will have a full opportunity to present additional evidence of injury and to deal with our criticisms.

■ For the further guidance of the district court on remand, we point out that the

general instruction on damages, while not incorrect, was confusing, or at least incomplete. The jury was told that "when personal property such as a business is damaged or partially destroyed the measure of damages is the difference between the fair market value of the property immediately before the damage and the fair market value of the property immediately after the damage." This formulation obscures the principle that where, as in this case, the trial is held long after the damaging event occurs, intervening events may show that any depression in market value immediately after the damaging event (the settlement with the Weekleys) was transient and inflicted no harm on the plaintiff, in which event the plaintiff is not entitled to damages. *Chronister Oil Co. v. Unocal Refining & Marketing,* 34 F.3d 462, 465 (7th Cir.1994).

We also remind the judge and the parties that the issue is not whether Transcraft would have to pay more for products liability insurance today than when it was insured by Liberty. It is whether it would have to pay more than a similar company not burdened by having the settlement with the Weekleys on its loss record (if the settlement is still on its loss record, for there is evidence that the insurers wipe the slate clean after five years). Galvin is not responsible for whatever general increase in insurance prices has occurred since the settlement, an increase, that is, that Transcraft would have had to pay regardless of its loss experience.

A further point to note is that the verdict form was incorrect. The jury should not have been directed, or permitted, to assess compensatory damages separately against Liberty and the other, the lawyer, defendants. (Recall that it assessed $500,000 against Liberty and $1 million against the lawyer defendants.) Where, as in this case, the injury to the plaintiff is indivisible, the jury should be asked to assess the damages caused by the injury, unless (as was not the case here) the jury is asked to assess the relative fault of the defendants for purposes of contribution among joint tortfeasors. E.g., *Douglass v. Hustler Magazine, Inc.,* 769 F.2d 1128, 1146 (7th Cir.1985). As is typical in cases in which, despite the clear rulings by this court in *Douglass* and other cases, the incorrect form is used, we do not

know whether the jury thought the total damages $1.5 million, or, as Galvin argues, $1 million, and merely wanted Liberty to be responsible for half that amount. We trust that the correct form will be used at the retrial. And since a plaintiff is entitled to only one recovery when it seeks damages for the same harm from multiple defendants, *Bosco v. Serhant,* 836 F.2d 271, 280 (7th Cir.1987), Galvin will be entitled to a "credit" of $500,000 against any judgment that Transcraft obtains against it. What rights if any Galvin and Liberty might have against each other is a question on which we express no view.

We reverse the judgment and remand for a new trial on liability and damages. And with one last reminder to the parties and the district court: for the reasons explained in this opinion, certain items of alleged negligence should not be submitted to the jury on retrial because it is plain either that they do not amount to negligence or that they cannot reasonably have been thought to have affected the outcome of the Weekleys' case.

REVERSED AND REMANDED, WITH INSTRUCTIONS.